JOHNDAHL, APPELLANT, *v.* COLUMBUS TROTTING ASSN., INC., APPELLEE.*

*Motion to certify the record overruled, October 17, 1956.

(No. 5299—Decided May 2, 1956.)

*Messrs. Power, Griffith & Jones* and *Mr. Frank J. Collopy,* for appellant.
*Messrs. Brownfield & Malone,* for appellee.

HORNBECK, J. This appeal is on questions of law from a judgment of the Common Pleas Court vacating a judgment for plaintiff, appellant herein, against defendant, appellee herein, on a note dated March 5, 1951, for the sum of $8,000, and in favor of defendant in the sum of $10,000 on the first cause of action of its third amended cross-petition and $6,221.88 on its second cause of action in the amended cross-petition, a total judgment in favor of defendant in the amount of $16,221.88 and costs. There is a third cause of action on which there was a finding against the defendant.

We hereinafter refer to the parties either as plaintiff or defendant, or as Johndahl, who is the plaintiff, or the association, which is the defendant.

On the 28th of May 1951, plaintiff took a judgment on a cognovit note in the sum of $8,108.29, which note was payable to plaintiff and signed by Charles D. Hill, as president of defendant, and Lyman H. Brownfield, as its secretary.

At the same term of court, on motion of the defendant, the judgment was suspended, with leave to the defendant to file its answer and cross-petition. Eventually, issue was drawn between the parties on the original petition of plaintiff, the third amended answer and cross-petition of defendant, and the reply and answer thereto. A jury was waived and the cause submitted to the trial judge who, in a written opinion, made a general finding in favor of defendant and, upon the motion of plaintiff, also made separate findings of fact and conclusions of law, and entered judgment thereon, as hereinbefore stated.

Plaintiff assigns 16 errors which he has incorporated into six groups, which grouping we will follow in the consideration of the appeal. The assigned errors are as follows:

1. The court erred in the admission of evidence and testimony offered by defendant, to which plaintiff objected.

2. The court erred in vacating the judgment previously rendered by the court in favor of plaintiff on plaintiff's petition and in rendering final judgment thereon in favor of defendant.

3. The court erred as a matter of law in determining and finding that the note of defendant in the amount of $8,000, and dated August or September 1950, was wholly unsupported by any consideration.

4. The court erred as a matter of law in determining and finding that the note bearing date of March 5, 1951, in the amount of $8,000, the subject of plaintiff's petition, was wholly unsupported by any consideration and was void and unenforceable.

5. The court erred in holding that a prior unasserted unliquidated tort cause of action constituted a demand and prevented consideration existing for a subsequent contractual obligation on the theory that cross-demands are deemed compensated.

6. The court erred in determining and finding that a secret or undisclosed profit in excess of $20,000 was made by or chargeable against plaintiff in the transfer of partnership assets to defendant.

7. The court erred as a matter of law in determining that a percentage of ownership basis is the only basis upon which partnership business may be sold and acquired in determining secret or undisclosed profits.

8. The court erred in holding that the test to determine promoter's profit is the true value of the assets transferred to the corporation, and that "original dollar investment is not a proper test therefor."

9. The court erred in placing the burden on plaintiff of proving the value of the assets transferred from a partnership to defendant corporation at the time of its incorporation.

10. The court erred in finding that assets of the partnership had a market or true value more than $20,000 and less than $93,000.

11. The verdict and judgment of the court in favor of defendant on defendant's third amended cross-petition were excessive.

12. The court erred in determining and finding that reimbursements made to plaintiff in the amount of $6,115.97 were not authorized or ratified and were illegal.

13. The court erred in overruling plaintiff's demurrer.

14. The findings of fact found by the court do not support the verdict or judgment.

15. The final judgment and order of the court, dated February 9, 1955, is contrary to and against the manifest weight of the evidence.

16. Other errors apparent upon the face of the record.

Such of the facts as are necessary to an appreciation of the questions on this appeal we state now, generally, and we will be more specific as we discuss the various assignments of error.

A partnership, known as Columbus Trotting Association and formerly known as Marion Raceway, was organized on or prior to the year 1948. It conducted a race meet at Hilliards, Ohio, in 1948. Plaintiff, as an original investment in June 1948 and by subsequent investments, placed a total sum of $18,500 into this partnership. The total investment of all partners was $120,000. The interests in this partnership were originally allocated as shares, and when new money was needed an assessment was made against the partners. Some paid these assessments and some did not, with the result that the respective investments did not maintain the same proportion of interest in the partnership as originally contemplated. On June 15, 1949, one Haines, plaintiff, and one Carlo called on Brownfield to discuss the incorporation of what eventually was defendant company, and thereafter, in July of the same year, the three men hereinbefore mentioned and one Reid, who was also a partner, came to Brownfield's office, employed him to incorporate the company and paid him $200 as a retainer, with instructions to proceed with the incorporation. By reason of delay, the company was not incorporated until September 16, 1949. In the first proposed application for certificate of incorporation, the value of the assets was fixed at $75,000, and thereafter, in the application which was used, the amount of the as-

sets was fixed at $92,500. An appraisal being requested by the Division of Securities, it was provided by itemization of the assets of the partnership, with plaintiff as the appraiser. Articles of incorporation were issued and the first shareholders' meeting was held on the 16th of September 1949, Haines acting as chairman of the meeting. The minutes of this meeting recite:

"The owners [of the partnership] have placed a valuation of $92,500 upon the assets, and it was proposed that the corporation accept them at this valuation. The chairman stated that the valuation had been approved by the Securities Division so that the corporation was authorized to issue stock for any part of the purchase price. He suggested that the stockholders consider the proposition, and if they approve the acquisition, to authorize action by the directors to acquire the property at the stated figure, issuing stock in exchange for the assets to such extent as the directors might desire.

"Whereupon, upon motion duly seconded and unanimously carried, it was

"Resolved: That the corporation take such action as may be necessary to acquire the leasehold and other assets of the Columbus Trotting Association, a partnership, at a price of $92,500, issuing in exchange therefor at $100 per share such portion of the purchase price as sellers will accept in the form of stock of the company."

At this meeting, provision was made for five directors of the company, and the titles and duties of the officers were fixed.

Among other duties of the president were:

"He shall exercise, subject to the control of the board of directors and the stockholders of the corporation, a general supervision over the affairs of the corporation, and shall perform generally all duties incident to the office and such other duties as may be assigned to him from time to time by the board of directors. He shall have authority to sign and execute contracts on behalf of the corporation."

Among other duties assigned to the secretary were:

"And generally perform such duties as may be required by the board of directors. He shall have authority to sign and execute contracts on behalf of the corporation."

At this juncture, it might be observed that the board of directors thereafter made no designation of further duties of the president or the secretary other than by inference.

At the first meeting of the directors, following the shareholders meeting and on the same day, Haines was elected chairman. It was noted that Brownfield, attorney for the company, was present, and thereafter Johndahl was elected president and Robert J. Reid, secretary and treasurer. The minutes of this meeting disclose substantially the same subject matter and resolution respecting the intention to take over the leasehold and assets of the partnership, their value and the issuance of the stock. The officers of the corporation were authorized to open savings and checking accounts, and the president and treasurer were authorized to make withdrawals against such account, singly and without countersignatures.

Although it is commonly agreed that plaintiff was named manager of the race meet to be held at Hilliards, we do not find it in the minutes. However, it is conceded that he was so recognized and so acted and was paid for his services in stock of the corporation. He served in that capacity and as president and manager of the defendant until March 1951.

At the meeting of the board of directors on March 12, 1951, plaintiff's resignation as manager for the association was announced and accepted. His formal resignation as member of the board of directors was tendered March 15, 1951.

A race meet was scheduled to begin at Hilliards on June 13, 1950. Robert Reid was then a director and shareholder of the corporation. About that time, the United States Trotting Association, of which defendant was an affiliate, notified it that the meet would not be sanctioned if Reid was permitted to continue as a shareholder of defendant corporation. This created an emergency situation. A meeting was arranged and held at the race track, at which were present plaintiff, Reid, the holder of the stock, his brother, and Brownfield, and a transaction took place whereby plaintiff advanced the sum of $10,000, and the Reid stock was turned over to him. Some few days thereafter, plaintiff was paid $2,000 by check of defendant, thus leaving $8,000 due him, which sometime thereafter was placed in the form of a note, signed by Johndahl, as president,

and Brownfield, as secretary, on behalf of the association, payable to Johndahl. The note and Reid's stock, endorsed in blank, were held by plaintiff until March 5, 1951, when a new note was given to plaintiff, which was carried into the judgment in his behalf, the validity of which is in dispute in this case. Plaintiff insists that he loaned the $10,000, with which the Reid stock was purchased, to the defendant, holding the stock as collateral for security for the loan. When the second note was given, this stock was turned over to the corporation and was held until after the judgment against it and until the time the motion of defendant to vacate the judgment in behalf of plaintiff had been filed.

No formal action appears in any of the minutes of the board of directors, authorizing the borrowing of $10,000 from the plaintiff, the execution of the note when the money was paid to Reid, or the execution of the second note. During the incumbency of plaintiff as director, president and manager of defendant, he incurred expenses, the amount of which, on itemization, were, at intervals, paid to him by check on the company, signed by himself as president, and Brownfield as secretary, and in instances by Brownfield as secretary only.

Plaintiff lived in Buffalo and, of course, as manager, had to come to Hilliards and live in the vicinity of the race meet while it was being conducted and during preparation for the meet. He, also, in his capacity as manager, was required to visit other localities to meet with horsemen in the interest of racing at Hilliards. He and two of the directors lived elsewhere than Franklin County, and one of the other directors was seldom at meetings of the board. Manifestly, there were current expenses which the manager had to meet. During the period of time between the first meeting of the shareholders and the board of directors and the meeting at which the resignation of plaintiff as manager was noted and accepted, there were but three meetings of the board of directors. In no one of them were any of the itemized expenses which had been incurred by and paid to the manager mentioned. There was, however, an audit of the affairs of the corporation, which included the payments to the manager. All, or practically all, these checks for expenses and the itemized statements were most of the time in the possession of the secretary.

The claim of the defendant respecting the note which was placed in judgment, the expense accounts of plaintiff and what has been designated "secret profits" appears in the pleadings and the findings of fact and conclusions of law of the trial judge.

Accompanying the motion for vacation of plaintiff's judgment is an affidavit of Charles D. Hill, then president of defendant company, of date May 28, 1951, in which are set out two reasons supporting the claim that the promissory note upon which judgment had been taken by the plaintiff was not a valid obligation of the corporation. They are:

1. Said note was given to the plaintiff by the defendant for the purchase of the defendant's own stock from the plaintiff, a transaction which the said corporation was wholly without authority to enter into. A certificate for the stock so purported to be purchased by said note has been returned to the plaintiff.

2. Said sale constituted a fraud upon the corporation in that plaintiff, who was at the time of said sale a director of the defendant corporation, sold said stock to said corporation at a price 50 per cent higher than the defendant corporation was in effect offering said stock to the public, pursuant to a registration with the Division of Securities.

Affiant further says that at a time when plaintiff was president and director of the defendant corporation, he caused to be paid to himself and to other people large amounts of money which were not in payment of any proper obligation or expense of the corporation, and that for such corporate expenditures the plaintiff is indebted to the defendant corporation in substantial amounts.

This affidavit was notarized by Lyman Brownfield of the firm which signed the motion as attorney for defendant.

It may be observed that in paragraph No. 1 of the foregoing affidavit the plaintiff charges that the transaction, wherein the note was given to plaintiff on which he took judgment, was *ultra vires* the corporation, and that the corporation had elected to avoid it and had returned the stock to the plaintiff. No mention is made of the first note. Neither paragraph No. 1 or No. 2 of the affidavit asserts that the stock, which it admits was purchased by the corporation, was of no value. The final paragraph of the affidavit avers that the expenses which had been paid to the plaintiff were for his own benefit and not for

any proper obligation or expense of the corporation. The basis of this claim of the defendant was not lack of authorization by the board of directors but unjustified and improper expenditures because for the personal benefit of plaintiff. No mention is made of secret profits realized by Johndahl or other partners in the partnership, the assets of which were later purchased by defendant.

The answer of defendant, which no doubt accompanied the motion and affidavit, in the first defense says that it (defendant) received no consideration whatsoever from the plaintiff for the execution of the note attached to plaintiff's petition. This first defense is identical in all the answers filed by defendant.

The second defense of the third amended answer and cross-petition, to which we hereinafter make reference, avers that the note upon which judgment was taken was given in payment for 80 shares of capital stock of defendant at a time when the capital stock had a fair market value of less than $100 per share, as plaintiff well knew. It is further averred that defendant had on May 18, 1951, notified plaintiff of a purpose to avoid and rescind the transaction relating to the note and had returned the certificate for the 80 shares of stock of the defendant to plaintiff and demanded return of its note. It will be noted that the second defense is inconsistent with the defense that there was no consideration for the note.

The third defense is that the transaction wherein the note was given and the purported purchase were *ultra vires* the corporation. The trial judge did not find that the transaction was *ultra vires*, and the averment, without qualification, that the corporation was not authorized by law to purchase its own stock is inexact. See (n) articles of incorporation of defendant. *Humphrey* v. *Koogler,* 10 Ohio Law Abs., 43.

The third amended cross-petition sets forth three causes of action. The first is for recovery of what has been designated ''secret profits'' realized by plaintiff in the transaction whereby the partnership assets were sold and transferred to the corporation. It avers that the plaintiff, who at all times mentioned was president and director of defendant, had caused it to be incorporated and certain assets to be transferred to the corpora-

tion, which had previously belonged to the partnership; that plaintiff, a member of the partnership and one of the owners of the proprety transferred, caused to be issued to him in exchange for his interest in said property 225 shares of stock of the defendant; that plaintiff caused the stock to be registered for sale at $100 per share and to be sold and exchanged for such valuation and represented to the defendant that his interest in said property had cost him in excess of $22,500, whereas, in fact, he had invested but a total of less than $12,500; and that, "by reason of such transaction plaintiff made a profit of $10,000 which he failed to disclose to the defendant."

It will be observed that the basis of the computation of defendant in reaching the amount of secret profits which plaintiff realized in the transaction involved was the difference between $22,500, which it is averred plaintiff represented "his interest in said property had cost him," and the actual amount which it did cost him. There is no proof that plaintiff made any representations at and prior to the incorporation of defendant as to the cost to him of the acquisition of partnership shares. See *Second National Bank* v. *Greenville Screw-Point Steel Fence Post Co.*, 3 C. C. (N. S.), 372. The record fairly discloses that the plaintiff had invested in the partnership and its assets, which were turned over to the corporation, the sum of $18,500 in cash. It should be observed that, in pleading this cause of action, there is no claim that the plaintiff was a promoter in the organization of defendant corporation, and that he should be charged in such relation with anything that the corporation may have lost by reason of his own profit and of the profit of other partners and promoters in the organization of the corporation. However, the evidence supports the findings that he was a promoter. *Second National Bank* v. *Greenville Screw-Point Steel Fence Post Co.*, *supra*; *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn., 101, 29 A., 303, 42 Am. St. Rep., 159, 25 L. R. A., 90.

The second cause of action is for expenditures of the funds of the corporation made by the defendant for lodging, food, entertainment, liquor, gasoline and other personal expenses of the plaintiff for which he was not entitled to reimbursement or exoneration, and for employee taxes paid by the defendant on

the plaintiff's salary. The amount of taxes paid by the defendant for the plaintiff were properly charged against him. The amount claimed under the second cause of action is $6,221.88.

The trial judge allowed the full amount prayed for—$10,000 on the first cause of action and $6,221.88, the full amount claimed on the second cause of action.

The plaintiff demurred to the first two answers and cross-petitions of the defendant, but did not demur to the third, but answered over.

The trial judge, in a written opinion, held generally with the defendant and thereafter made separate findings of fact and conclusions of law. We may resort not only to the findings of fact and conclusions of law but to the opinion of the trial judge to determine his holdings and the basis therefor. *Andrews* v. *Board of Liquor Control,* 164 Ohio St., 275, 131 N. E. (2d), 390

We have, in probability, set forth enough of the factual developments and some aspects of the legal questions raised by the record to give some attention to and to afford an appreciation of the specific assignments of error.

The first is, that the court erred in the admission of the testimony and evidence of Brownfield on behalf of the defendant. The basis of this assignment is that the detailed information respecting the assets of the partnership, the value thereof, how acquired by plaintiff, etc., came to him in his capacity as attorney for the plaintiff and the partnership and were therefore privileged communications. The facts which were carried into the application for incorporation of the partnership and the appraisal of its assets became public property or were provided to Brownfield with the intention that they be so used and therefore may not be said to be confidential in nature. We cannot hold that the testimony of Brownfield to the extent to which the objections of plaintiff were directed was confidential. In the meetings where Haines was present, as he was not a partner, the communications there made to Brownfield were not privileged by the rule. In any instance, where only a partner other than the plaintiff was present, his presence would not relieve against the rule as each was agent of the other, if Brownfield was attorney for plaintiff. We can do no better than to

direct attention to some of the aspects of the law of confidential communications that in our view should govern upon a retrial of the case and which will be found in 42 Ohio Jurisprudence, 282 and 284, Sections 282 and 283; *Swetland* v. *Miles,* 101 Ohio St., 501, 130 N. E., 22; *Foley* v. *Poschke,* 137 Ohio St., 593, 31 N. E. (2d), 845.

The second grouping of assignments of error is directed to the vacation of the judgment, the finding that the first note for $8,000 payable to plaintiff was wholly unsupported by any consideration, the holding that the second note upon which judgment was taken was unsupported by any consideration and the holding that a prior unasserted unliquidated tort cause of action consisted of a demand and prevented consideration existing for a subsequent contractual obligation on the theory that cross-demands are deemed compensated.

The trial judge, in his opinion and in the findings of fact and conclusions of law, held that the first note given to plaintiff was without consideration, and that there was no other or further consideration for the giving of the second note. As we have hereinbefore indicated, except in the first defense of the answer of defendant, there is no claim that the note placed in judgment was without consideration.

Had the judge, in the opinion and findings, grounded his conclusion on complete want of consideration for the note in judgment, without more, we would have a simpler question. But he predicated his conclusion, in part, on the application of the theory of cross-demands and particularly on Section 2309. 19, Revised Code. In the opinion, the trial judge, after saying that the plaintiff was not a holder in due course of the note reduced to judgment and finding that there was no legally sufficient consideration for the first note and that it could not be the basis for a finding of legally sufficient consideration for the the second note, continued:

"Our conclusion that the first note did not have a legally sufficient consideration is supported by the axiomatic rule of Ohio Jurisprudence to the effect that cross-demands must be deemed compensated.

"* * * The alleged demand of the plaintiff Johndahl is obvious, *i. e.,* an $8,000 claim evidenced by the note. What, we

must ask, was the cross-demand of the defendant corporation against Johndahl which had 'matured' prior to August or September, 1950 (when the first note was executed) or even prior to June 10, 1951, when the Reid transaction occurred.

"As we see it, a 'cross-demand' for 'watering' the value of the property put into the corporation arose, matured and was fully enforceable in favor of the defendant corporation and against plaintiff Johndahl on a joint and severable basis from the date the corporation came into existence on September 16, 1949, and remains fully enforceable to this day."

He then holds that Johndahl the "promoter" of the corporation was, together with the other promoters, liable to the corporation for any unlawful profit that he realized in the sale of the partnership assets, citing the well recognized principle that Johndahl, as the promoter, was under obligation to make full disclosure to the company of his relations to the property which was being conveyed to the corporation, its value and incumbrances. He holds further that there was a matured cross-demand in favor of the defendant against the plaintiff for an amount in excess of $20,000, and then states:

"We believe, accordingly, that the first defense of the answer, *i. e.*, a want of consideration for the plaintiff's note has been established by what we regard as 'clear and convincing' evidence."

In the conclusion of law, it is said in No. 5:

"Cross-demands must be deemed compensated."

Section 2309.19, Revised Code, upon which the court relied, in part, in finding no consideration for the note in judgment and as supporting the first cause of action of the cross-petition, reads:

"When cross-demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, neither can be deprived of the benefit thereof by assignment by the other, or by his death. The two demands must be deemed compensated so far as they equal each other."

This section was not purposed to create the right of cross-demand which, of course, attends if there are such demands between parties to a lawsuit. If a claim or demand is without

merit and therefore of no value, obviously, it may not be employed to compensate to any degree a valid demand. Thus, in this case, if there was no consideration for the note which was carried into judgment, it afforded no ground whatever for a reduction of any valid claim in behalf of the defendant on the first or second cause of action of its cross-petition. If the doctrine of compensated demands be given application, as it appears the court intended, then, it should have been used to reduce the amount claimed by defendant as secret profits in its first cause of action. Although the court so treated it, it did not diminish the amount awarded defendant on the first cause of action in any amount. If it is conceded that the promoters secretly profited to the extent of $20,000, defendant did not claim that amount and it may not be used in that amount against which the demand on the note may be compensated.

We now come to the holding that there was no consideration whatever for either note which was given to plaintiff by the defendant corporation. We are of opinion that the holding that the first note was without any consideration whatever is unsupported by the evidence, if the defendant's theory that it purchased the stock for which the note was given is accepted.

As we read the record, the defendant's claim on the evidence, as to the first note, is that plaintiff, and not defendant, purchased the stock. Whether it purchased the stock in the first instance is not controlling because, even though no consideration is shown for the first note, there may have been consideration for the second note. The logical inference to be drawn from the meager facts surrounding the giving of the first note is that the intention of the parties was that the Reid stock be sold to the corporation. It was the corporation not the plaintiff which was most vitally affected by the retention by Reid of the company stock. The fact that the plaintiff, in signing the note, was acting in a dual capacity requires the closest scrutiny before he is permitted to benefit by the transaction. Did he deal honestly and fairly with his company? *United States Rolling Stock Co.* v. *Atlantic & Great Western Rd. Co.*, 34 Ohio St., 450, 32 Am. Rep., 380. But Brownfield, as secretary, also signed the note and he was also a director and attorney for the company. A director is not prohibited from lending

money to his corporation when it is needed for its benefit and the transaction is open and otherwise free from blame. *Callahan* v. *Owen Steel Crane Co.,* 20 C. C. (N. S.), 78; *McClean* v. *Bradley* (C. C. A., 6), 299 F., 379.

It is inferable that the operation of the affairs of the company was, at the time that plaintiff was with it and after he left, largely turned over to the president and secretary. The minutes of the board reflect but a small part of the activities which were by common consent carried on for the corporation by these officers. Brownfield knew the pressure which was upon the corporation and that it did not have the cash to buy the Reid stock. As a witness, he did not say that plaintiff bought the stock for himself. As an attorney for the company he was bound to protect its interest. It is not probable that he would sign a note obligating his company for $8,000 without full appreciation of the situation. The failure to call either one of the Reids as a witness to the giving of the first note is difficult to comprehend. A short time after the giving of the note, plaintiff was paid $2,000 on a company check signed as other checks, which payment must have been intended as a credit on the $10,000 advanced. Some of this stock which plaintiff claimed to have held as collateral was transferred by the company to a purchaser prior to the giving of the second note.

Without respect to the nature of the transaction respecting the first note, evidently the second note, even upon the claim of defendant, was for the purchase price of the Reid stock then turned over to the company by plaintiff. Not only does it appear that plaintiff, whether he purchased the stock for himself or for the company, advanced $10,000 to pay for it, but, thereafter, a president of the company other than plaintiff, and Brownfield, as secretary, by signing and executing the second note represented that its consideration was $8,000. In *Cincinnati, Hamilton & Dayton Rd. Co.* v. *Harter,* 26 Ohio St., 426, it was held that a deed executed by the president of a company in due form, under seal of the corporation, would be presumed to have been authorized by the directors, and the mere fact that such authority was not found on the minutes would not rebut that presumption.

In the present case, at about the time the second note was

given the plaintiff, when he had lost control of the company, he was paid more than $21,000 for the stock which he held in the corporation. The stock purchased by Hill did not include the stock sold to the corporation by Johndahl, and Hill must have been conversant with the fact that the corporation was the owner of the Reid stock.

Also, at about this same time, the corporation decided to issue more stock, in part on the same assets it had received from the partnership. All this is convincing, almost to a degree of certainty, that at all times involved in this lawsuit the stock for the purchase price of which the notes were given was of considerable value.

However meager the knowledge of the board of directors may have been at the time the first and second notes were given, it must have known of the indebtedness when, in its minutes, it appears that attention was directed to an obligation to the plaintiff in an amount which must have included that which was due on the second note. This could well be found to be a ratification of the execution and delivery of the second note.

The disavowal by the board of its obligation on the note was not timely. It did not occur until after judgment had been taken on the note. Prior to that time, it had by its attorney expressly admitted indebtedness and indicated a purpose to liquidate it.

The law requires a corporation, the agent of which has exceeded his powers, to be prompt in disavowing the agent's acts, else the presumption of the law is that it acquiesces in that action. *London & Lancashire Indemnity Co. of America* v. *Fairbanks Steam Shovel Co.*, 112 Ohio St., 136, 147 N. E., 329.

Inasmuch as the theory of the defendant has been at all times from the filing of its affidavit in support of its motion to vacate, and through all its pleadings, that the corporation in buying the stock acted *ultra vires* and the court did not find the defense of *ultra vires* established, the determinative factor was the value, if any, of the stock which plaintiff sold to the defendant and for which he took the note which was placed in judgment.

For two reasons, there is insufficient basis for the holding that the note was without consideration. One, manifestly, the

stock was of some value. Two, its actual value, if less than that claimed by plaintiff, was not established and no evidence other than the appraisal of plaintiff was introduced upon which the court could evaluate it.

The assets of the partnership which were transferred to the corporation by the bill of sale and as appraised by the plaintiff were as follows:

Lease and leasehold improvements:

| | |
|---|---|
| Office building | Restaurant building |
| Grandstand | Power lines |
| Mutual plant | Two substations |
| Barns | Paving |
| Fences | Track |
| Veterinary office building | |

$73,000

Equipment:

| | |
|---|---|
| Amplifying system | Truck |
| Intercommunications system | Jeep |
| | Awnings |
| Night racing flood lights | Uniforms |
| Yard lighting | |

$15,000

Office furniture and equipment:

Desks
Chairs
Cabinets
Typewriter
Adding machine
Duplicating machine                         $   500
Cash and money on deposit                    4,500

Total                                      $93,000

The appraisal of these assets, which was but an opinion of value, was made by the plaintiff. The amount above allocated to lease and leasehold improvements was increased over the first appraisement by about the sum that the partnership

claimed it had expended subsequent to the first appraisal. Whether any or all of this addition was justified is not controlling of the question of total want of consideration for the note, although it is germane to the first cause of action of the cross-petition.

The second group of assignments of error is directed to the finding of the court that plaintiff realized secret undisclosed profits in excess of $20,000 in the transfer of the partnership assets to the defendant. From what we have hereinbefore said respecting the errors directed to the vacation of the judgment, it follows that there was insufficient basis to make a determination of the extent of secret profits, if any, to the promoters, and that there was insufficient proof to support the finding of the trial judge that the assets of the partnership were of the value of $20,000, less than the appraisal of plaintiff. No witness, other than plaintiff, gave any testimony upon that specific question. It was resolved largely upon the fact of the difference in the appraisals and because the partnership had, prior to the incorporation, lost heavily in its venture.

The basis of the finding of the trial judge is found in findings of fact Nos. 7 and 8:

"7. Plaintiff, Carl L. Johndahl, as a promoter, director and president of the defendant corporation, failed to disclose to the corporation and its other directors and officers that the assets of the Columbus Trotting Association partnership, at the time of the transfer of said assets to the corporation in exchange for the stock in defendant corporation, were of a market or true value more than $20,000 less than the $93,000 plaintiff then represented them to have.

"8. By the action recited in paragraph 7 of these findings of fact, plaintiff, Carl L. Johndahl, and his associated promoters, were making an undisclosed profit in excess of $20,000."

Manifestly, it was basic to finding No. 7 that the market or true value of the assets of the partnership at the time of the transfer to the corporation be established. Further, it was essential that the promoters profit and that their profits be secretly obtained. The recovery is limited to the profit actually made by the promoters in the transaction under consideration. *Marblehead Bank Co.* v. *Raridon,* 4 Ohio App., 468; *Louden-*

*slager* v. *Woodbury Heights Land Co.*, 58 N. J. Eq., 556, 43 A., 671.

The court did not, for its determination, use the ground upon which defendant relied in its first cause of action, viz., the difference between the total investment of partners in the partnership and the amount which plaintiff and his associates paid for it.

The test, which must be applied to determine whether the property transferred to the defendant corporation by the bill of sale from the partnership was of less value than appraised by plaintiff and formally accepted by the corporation, is not what plaintiff and associates may have paid for the interests of some of the other partners but the value which they received by such purchases, together with the value of the other holdings of the partnership.

That the leasehold of the partnership and later of the corporation was a valuable franchise is demonstrated by its terms and the privileges granted therewith. The partnership and later the company had a virtual monoply on harness racing in the vicinity of the Hilliards track. The leasehold carried the betting privileges, the concessions and other valuable rights. It was testified that it was not unusual for promoters to lose money on race meets in the first instance. That such a loss did not deter the corporation from carrying on is manifest by its action succeeding the 1950 meet. That the corporation has succeeded financially is suggested by the trial judge in his opinion.

Much has been said by court and counsel differentiating the interests of partners as proportionate shareholders in the partnership or according to the amount of money that each had invested therein. No substantial reason appears for any such distinction because the determinative value of the interest of each partner would be in the proportion his investment bore to the total worth of the partnership assets at the time they were transferred to the corporation. It is clear that the plaintiff had invested, in cash, in the partnership assets a sum equivalent to the face value of the shares of the corporation which were issued to him by reason of the transfer of the assets to the corporation. The corporate stock for which plaintiff exchanged his interest in partnership assets was sold by him at a substantial loss.

We hold that, inasmuch as the plaintiff was in the status of a fiduciary toward the corporation, upon the claim that he had by the transaction in question failed to protect the interest of the corporation, the burden was upon him to meet this averment. We do not say that there is no basis whatever for a finding that the plaintiff realized some secret profit in the transfer to the corporation of the assets of the partnership, but that the evidence does not support the amount found, and there was insufficient evidence to afford the trial judge any reasonable basis upon which to fix the amount thereof. The record also would support a finding in behalf of the plaintiff on this issue.

The next error relates to the finding in favor of the defendant as to the expense money paid to plaintiff, which defendant claims was not a proper expense chargeable to the corporation. As we have hereinbefore indicated, the defendant bases its claim for recovery upon the contention that the expenses were incurred for the personal benefit of the plaintiff and not on behalf of the corporation. This, then, would be the test to be applied by the trial judge.

We shall not attempt to analyze these accounts for expenses, which were in every instance itemized and for which checks were issued, signed jointly by plaintiff, as president, and the secretary, and which were before the board of directors for consideration when the books of the corporation were audited, other than to say that, in our judgment, the trial judge applied too strict a test in holding against the plaintiff.

The basis of the holding of the trial judge was that, inasmuch as there was no formal corporate action, as provided by statute, authorizing the expenditures, they should be disallowed in their entirety. That holding did not give consideration to the averment of the second cause of action of defendant's cross-petition or to the principle announced by our Supreme Court in *Kimball* v. *Kimball Bros., Inc.*, 143 Ohio St., 500, 56 N. E. (2d), 60, and particularly in the third paragraph of the syllabus thereof:

"When the board of directors of a corporation fails to function and leaves to the executive officers thereof duties which properly belong to such board and the shareholders ac-

quiesce in that course of conduct, such officers have implied authority to perform those duties which are usual and necessary in the conduct of the business.''

Coming then to the specific assignments of error, we find the first is not well made. We hold that the second, third, fourth, fifth, sixth, seventh, tenth, eleventh, fourteenth and fifteenth are supported. The eighth, ninth and twelfth are determined as qualified by this opinion. The thirteenth is not exemplified by the record.

No specific assignment of error is directed to the action of the trial judge in overruling the motion of plaintiff to vacate the order suspending the judgment against the defendant.

The judgment of the Common Pleas Court is reversed and the cause is remanded to that court for further proceedings according to law and in accordance with this opinion.

*Judgment reversed.*

DEEDS, J., concurring. It is my view that the first assignment of error should also be determined as qualified by the majority opinion and not overruled.

MILLER, P. J., concurring in part. I concur in the judgment to the extent that there should be a reversal, but not that the cause should be remanded for a new trial.

The record discloses that the motion to vacate the judgment was submitted in the following form:

''Now comes defendant Columbus Trotting Association, Inc., by its attorneys, and moves the court for an order vacating and setting aside the judgment heretofore entered herein, for the reason that the note upon which said judgment was entered was not supported by any consideration, and for the further reason that the defendant has substantial claims against the plaintiff which are available as either setoff or counterclaim if the said note should be found to be a legal obligation.''

In passing upon this motion the only question for the determination of the court was whether there was any valuable consideration for the note upon which the judgment was taken since a setoff or counterclaim is not a defense to such an action.

In *Bulkley* v. *Greene*, 98 Ohio St., 55, 120 N. E., 216, it is said in the third paragraph of the syllabus:

"A counterclaim cannot be made available under Section 11635, General Code, as a basis to vacate a judgment by confession. Such is not a defense to the action within the purview of that section."

The term, "valuable consideration," seems to be well defined as follows in 11 Ohio Jurisprudence (2d), 304, Section 67:

"A valuable consideration may consist either in a benefit to the promisor or a detriment to the promisee. More elaborately stated, a valuable consideration may consist either in some right, interest, profit, or benefit accruing to the promisor or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the promisee."

That it may consist of a benefit to the promisor or a detriment to the promisee is clearly set forth in *Dalrymple, Admr.,* v. *Wyker, Admr.*, 60 Ohio St., 108, 53 N. E., 713, the syllabus of which reads as follows:

"1. An answer to a suit on a promissory note, averring that there was no consideration for it, moving to the promisor, is not sufficient as a defense, as it does not preclude the possible fact that there was detriment or loss to the promisee, which constitutes a consideration for a promise as well as a benefit to the promisor.

"2. Where the issue is as to whether there was a consideration for a promissory note, and the evidence offered simply shows that there was no benefit to the promisor, and does not exclude the possibility that there was detriment or loss to the promisee, it is insufficient to support the issue.

"3. The law presumes the existence of a consideration for a promissory note; and this presumption continues until it is shown that there was none; and the burden of showing this is on the party attacking the note for want of consideration."

The record discloses, and it is undenied, that Johndahl advanced the sum of $10,000 for the purchase of stock of the defendant corporation, either for himself or for the corporation, the same being in dispute, in order that Reid might no longer have an interest in the corporation and therefore clear the way for the races to be held as scheduled. Clearly, this action by

Johndahl was a detriment to him and a benefit to the corporation. Therefore, in my opinion, there was a consideration for the first note for $10,000. Then, as a consideration for the second note for $8,000 and upon which the judgment was taken, the first note was surrendered and also 80 shares of stock which certainly had some value, for on the same date the then president, Hill, purchased 420 shares of the same kind of stock from Johndahl for the sum of $21,000. But it is urged that Johndahl, at the time of the foregoing transaction, was indebted to the defendant corporation for secret profits acquired by him at the time the corporation was organized and also for expense money which he had received and to which he was not entitled; and that under Section 2309.19, Revised Code, these demands must be deemed compensated and thus all consideration for the notes is eliminated. The trial court adopted this view and therefore sustained the motion to vacate the judgment. Looking to the cited section of the Code, we find it to be as follows:

"When cross-demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, neither can be deprived of the benefit thereof by assignment by the other, or by his death. The two demands must be deemed compensated so far as they equal each other."

This section appears to be remedial and to have been enacted in order that one party may not be benefited by the assignment of his claim to the detriment of the other party, when cross-demands exist between the parties. It certainly does not provide that an obligation can not be created merely because an unliquidated or uncertain or contingent claim might exist against one party. It also should be noted that the statute requires that before a cross-demand may be asserted it must exist under such circumstances that a counterclaim could be set up if one party had brought an action against the other. The alleged secret profits or unauthorized payment for expenditures to Johndahl would not constitute a valid counterclaim to an action on the note or for the money advanced prior to the execution of the same. A counterclaim is defined in Section 2309.16, Revised Code, as follows:

"A counterclaim is a cause of action existing in favor of

one or more defendants against one or more plaintiffs or one or more defendants, or both, between whom a several judgment might be had in the action, and arising out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim, or connected with the subject of the action or arising out of contract or ascertained by the decision of a court.

"Such counterclaim shall not be limited to the amount claimed by the plaintiff or defendant against whom such counterclaim is asserted."

To be proper, a counterclaim must meet one of the following conditions, to wit:

1. Arise out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim.

2. Be connected with the subject of the action.

3. Arise out of contract.

4. Be ascertained by the decision of the court.

The causes of action set forth in the cross-petition did not arise out of the contract or transaction set forth in the petition; they did not arise out of contract; they have not been ascertained by the decision of a court; and they are not connected with the subject of the action.

In *Price* v. *Kobacker Furniture Co.*, 20 Ohio App., 464, 152 N. E., 301, the court held in the syllabus:

"1. The language employed in Section 11317, General Code, has purposely been made comprehensive in its terms and general in its expression, and should be given a liberal construction to avoid a multiplicity of suits.

"2. The question whether a counterclaim comes within the section above referred to should be determined from the facts and circumstances of each particular case, and the invention of a rule to fit all cases that may arise in the future is inadvisable."

It appears in that case that a debtor was sued on an account for goods sold and delivered. A cross-petition was filed setting up by way of counterclaim a cause of action for damages which the defendant claimed to have sustained through being blacklisted as to his credit by the plaintiff. The court held such cause of action by way of counterclaim was demurrable for the reason that it did not show a cause of action aris-

ing out of the contract or transaction set forth in the petition or connected with the subject of the action.

A similar question was before the Supreme Court in *McMurray* v. *Vaughn's Seed Store,* 117 Ohio St., 236, 157 N. E., 567, in which Judge Matthias, at page 238, said:

"The questions here presented arise out of the claim made by the defendant against the plaintiff by way of cross-petition, denominated therein a 'setoff.' The averments thereof clearly constitute it an action for damages for alleged negligence upon the part of the plaintiff. Two specifications of negligence are made, the first being that plaintiff shipped to the defendant a ton of shredded cattle manure in soda ash bags which had not been completely cleaned, and the second, that the plaintiff failed to inform the defendant of the presence of soda ash in such cattle manure. It was asserted that 'because of such negligent and careless acts of the plaintiff' the defendant was injured, etc. This is clearly an action *ex delicto.* Not only was it so pleaded, but it was tried and submitted to the jury as an action *ex delicto* and nothing else. It had no relation whatever to the claim sued upon by the plaintiff, which was for merchandise furnished and delivered to the defendant in November, 1922, while the wrongful and negligent acts of the plaintiff complained of by the defendant, and because of which damages are sought, occurred two years prior thereto. The defendant's cause of action, therefore, did not arise out of the contract or transaction set forth in the petition, nor was it 'connected with the subject of the action.' Hence it cannot properly be set up as a 'counterclaim.' It was so denominated in the original answer of the defendant, and the Court of Common Pleas properly sustained a demurrer thereto, but the court granted leave to amend by simply striking out the word 'counterclaim' and substituting the word 'setoff,' without any change whatever in the averments of the answer. Regard should be had for the substance, rather than the form. The name given the pleading should not be decisive of its virtue or validity:

"It is provided by Section 11315, General Code, that:

" 'The defendant may set forth in his answer as many grounds of defense, counterclaim and setoff as he may have, whether such as heretofore have been denominated legal or equitable, or both.'

"Section 11371, General Code, defines a 'counterclaim.' For the reasons above indicated, the defendant's cause of action does not come within that definition.

"As defined by Section 11319, General Code, a 'setoff is a cause of action existing in favor of a defendant against a plaintiff between whom a several judgment might be had in the action, and arising on contract or ascertained by the decision of a court. It can be pleaded only in an action founded on contract.' "

Section 2309.16 of the Revised Code in effect combines the former General Code sections as to counterclaims and setoffs. Defendant's first and second causes of action do not qualify as either counterclaim or setoff, and they do not qualify under the provisions of Section 2309.16, Revised Code.

The record reveals that, at the close of all the evidence admitted upon the motion to vacate the judgment, counsel for the plaintiff entered the following motion:

"We move that the court overrule the motion that the defendant filed herein, that the court remove the suspension of this judgment, and that the court permit the execution and collection of the judgment."

The motion was overruled and counsel for the plaintiff replied, "Well, to that ruling I note the most strenuous objection." It is my conclusion that the court erred in its ruling, as the evidence clearly indicates that a valuable consideration was given for the note upon which the judgment was taken. The manner in which a judgment may be suspended or vacated is well stated in *Canal Winchester Bank* v. *Exline*, 61 Ohio App., 253, 22 N. E. (2d), 528, the second paragraph of syllabus of which reads as follows:

"To suspend a judgment during the term in which the judgment is taken, if any of the grounds set forth in Section 11631, General Code, are assigned as a reason for the action sought, it is necessary that the court find that the ground set forth in the motion is well made and further that an answer has been tendered with the motion showing that there is a valid defense to the action in which the judgment was rendered, in compliance with Section 11637, General Code, and until it is adjudged that there is a valid defense to the action, such judgment will not be vacated upon motion or petition."

The procedure to be followed in vacating a judgment is found in Sections 2325.06 and 2325.07, Revised Code (Sections 11636 and 11637, General Code), to wit:

2325.06. "The Court of Common Pleas or the Court of Appeals must try and decide upon the grounds to vacate or modify a judgment or order, before trying or deciding upon the validity of the defense or cause of action."

2325.07. "A judgment shall not be vacated on motion or petition until it is adjudged that there is a valid defense to the action in which the judgment was rendered; or, if the plaintiff seeks its vacation, that there is a valid cause of action. When a judgment is modified, all liens and securities obtained under it shall be preserved to the modified judgment."

We desire to quote further from the *Canal Winchester Bank case, supra,* page 256, wherein Judge Hornbeck said:

"We have heretofore referred to *Metzger* v. *Zeissler,* 13 N. P. (N. S.), 49, 22 O. D. (N. P.), 63, with approval. The first two propositions of the syllabus of this case determine that with the motion setting forth grounds for vacation of the judgment the defendant should by affidavit or orally or by both methods present his evidence in support of the motion. Section 11636, General Code. The third paragraph of the syllabus is pertinent to the proper procedure here:

"'At the same time the defendant should proffer a verified answer to the petition, setting forth *affirmatively* facts showing nonliability in whole or in part. If the answer does not state facts which, if established, would constitute a defense to the claim, the proceeding will be treated as at an end and the judgment will not be disturbed * * *.' (Italics ours.)

"It should be borne in mind that the requisites of a valid defense to a cause of action in a proceeding to open up an existing judgment may be different than when filed within rule and before judgment. Before judgment a defendant is well within his rights in setting up in his answer a general denial of the averments of the petition but such pleading should not be permitted in a proceeding to suspend or vacate a judgment. So that what may be a defense before judgment may be entirely inadequate and insufficient to warrant an adjudication, under Section 11637, General Code, that there is a valid defense to

the action upon which judgment has been taken. In the light of this announcement of principle the averments of the amended answer should be considered.''

Since the grounds for the vacation of the judgment were not established, in my opinion, the judgment should not have been vacated. On the other hand, the plaintiff's motion should have been sustained and the judgment re-entered. The cause of action set forth in the plaintiff's petition would then have been adjudicated and there would have been no further issues pending in the original action, as the tendered answer and cross-petition should have been stricken.

The judgment of the trial court should be reversed and judgment re-entered for the plaintiff.

DEEDS, J., of the Sixth Appellate District, sitting by designation in the Second Appellate District.